# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

WILLIAM JACKSON ADAMS,     )
                                       )
        Plaintiff,           )
                                       )
v.                             )     **CIVIL ACTION 07-0864-WS-B**
                                       )
CITY OF MOBILE, et al.,       )
                                       )
        Defendants.      )

## ORDER

This matter is before the Court on the defendants' motions for summary judgment. (Docs. 43, 45). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 44-50, 52-53, 55-59), and the motions are ripe for resolution. After carefully considering the foregoing and other relevant material in the file, the Court concludes that the motions as to defendants City of Mobile ("the City"), Mobile Police Department ("MPD"), John McLain, and Joey Goff are due to be granted and that the motions as to defendants Stephen Powell and Anthony Sanchez are due to be granted in part and denied in part.

## BACKGROUND

The plaintiff provides horses for riders in various Mobile parades. During the December 2005 GMAC Bowl Parade, the plaintiff reached the conclusion that riders were being pulled out of the parade prematurely. He addressed defendant Powell, a Mobile police officer, about the situation. According to the plaintiff, first Powell and then fellow officer Sanchez began assaulting him.

The plaintiff sued Powell and Sanchez (collectively, "the officers"), along with the City and MPD (collectively, "the governmental defendants"), Captain McLain, and fellow officer Goff. The complaint asserts seven claims raising the following causes of

action against the designated defendants:

- One  Fourth Amendment  All defendants
- Two  Assault  Powell, Sanchez, Goff
- Three  Negligence  Powell, Sanchez, Goff
- Four  Respondeat superior - Officers  City, MPD
- Five  Negligence  City, MPD, McLain
- Six  Respondeat superior - McLain  City, MPD
- Seven  Willfulness/wantonness  Powell, Sanchez, Goff, McLain

## FACTUAL POSITIONS

The defendants naturally have a more favorable version of events.  Because what matters on motion for summary judgment is not their version but that of the plaintiff and his witnesses, the Court summarizes their testimony below.  In doing so, the Court includes both the deposition excerpts submitted by the plaintiff and those submitted by the defendants.[1]

The plaintiff testified that, in years past, his horses have remained in the parade until reaching a point on south Royal Street, where his helpers retrieve them and return them to a trailer for transport.  Because he had heard nothing different with respect to the 2005 GMAC Bowl Parade, he was surprised to see two riders on a darkened Church Street rather than on the parade route.  The riders advised the plaintiff that police officers along the parade route had sent them this way.  The plaintiff had the riders go with him to the corner of Church and Royal, where he encountered Powell.

The plaintiff testified that he explained to Powell that he owned the horses and that

---

[1]*See, e.g.,  Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001) ("On review of a summary judgment order, the Court must consider all of the parties' evidence ....").

they had to go down Royal Street.  Powell argued with the plaintiff about this, and during this argument the plaintiff's helpers took the two horses down Royal.  The plaintiff asked Powell to call a superior to confirm his story, but Powell, standing two or three feet away, was silent.  Powell came at the plaintiff, said "I've had enough," and extended his hands towards the plaintiff.  The plaintiff raised his hands defensively, moved them to indicate, "hold on a minute," and said, "Whoa."  Powell grabbed the plaintiff around the neck and clothes.  The plaintiff's hands touched Powell, but he did not strike or swing at Powell. (Plaintiff Dep. at 122, 128, 130-34, 136).

Powell lifted the plaintiff by the neck so that only his toes were on the ground. The plaintiff tried to push Powell off.  Another officer ran up behind the plaintiff and struck him in the back of his head with a flashlight.[2]  The officer behind the plaintiff caught one shoulder and pulled the plaintiff around. The other officer had his other shoulder, and the two of them threw the plaintiff on the ground.  In this maneuver, the plaintiff's face hit the asphalt.  One sat or knelt on each shoulder "and beat the s**t out of" him.  One officer put a knee in his back.  (Plaintiff Dep. at 131-32, 135-36, 143-45, 147, 154).

Sandra Adams, the plaintiff's daughter-in-law, was one of his helpers.  According to Adams, Powell poked the plaintiff and grabbed him by the collar.  Adams is not sure where the plaintiff's hands were when Powell grabbed him by the collar, but she saw no act of aggression by him.  Powell spun the plaintiff around and had him in a headlock. The plaintiff was just standing there. Another officer came over and kneed the plaintiff in the stomach and groin area five or six times.  One of the officers, probably the first one, then hit the plaintiff on the back of the head and the shoulder blades with a flashlight, and threw, pushed or shoved him on the ground.  Powell smashed the plaintiff's head and shoulder into the ground and used his right hand to beat the plaintiff in the rib area.

---

[2]Although unidentified by the parties, the Court assumes for present purposes that the second officer was Sanchez.

Adams and another female helper tried to pull the officers off the plaintiff, hit at them with their hands, grabbed their jackets, and yelled at them to stop.  The episode of physical contact against the plaintiff lasted up to two minutes. Later, she heard from Powell, the plaintiff, and an unknown witness that the plaintiff hit Powell at some point before the headlock, but Adams — who briefly turned her back during the incident — did not see this.  (Adams Dep. at 58-63, 68-69, 74).

Angela Parker was another helper.  According to Parker, the plaintiff was gesturing down Royal Street about his need to get his horses, bringing his arm up and away from the officer in the process.  Powell poked the plaintiff in the chest with his finger, pushed the plaintiff back about a foot, grabbed his jacket collar, pulled the plaintiff into him, and hit the plaintiff on the left side of the face with his right fist.  The plaintiff responded by hitting Powell in the face or neck with his right hand.  Powell grabbed the plaintiff in a headlock and moved to the plaintiff's side.  (Parker Dep. at 58, 60-61, 63-64).

Sydney Whiting was yet another helper.  According to Whiting, Powell attempted to push the plaintiff back, but she does not know if he touched the plaintiff.  The plaintiff swung at Powell, but she does not think he connected.  Powell grabbed the plaintiff, another officer arrived, and together they threw him face down on the ground.  One officer had a knee between the plaintiff's shoulder blades.  The officers had the plaintiff's arms pulled up behind him, and one of them began beating the plaintiff on the head with a flashlight.  (Whiting Dep. at 27-29).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).

"To the extent that evidence conflicts at summary judgment, the district court has an obligation to view all the evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Allen v. Board of Public Education*, 495 F.3d 1306, 1315 (11th Cir. 2007) (internal quotes omitted).

## I.  The Individual Defendants.

The plaintiff concedes that Goff is entitled to summary judgment on all claims against him.  (Doc. 52 at 9, 11, 12-13).  The plaintiff also concedes that McLain is entitled to summary judgment on all claims against him.  (Doc. 53 at 7).  The Court therefore considers the motion for summary judgment as it relates to Powell and Sanchez.

Count One alleges that the officers used excessive force in violation of the Fourth Amendment.  Count Two alleges that they committed an assault.  Count Three alleges that their conduct resulted from carelessness, neglect or unskillfulness.  Count Seven alleges that they acted willfully, maliciously, in bad faith, and beyond the scope of their authority.  (Doc. 1 at 4-7, 9-10).

### A.  Evidentiary Considerations.

The defendants begin by citing several discrepancies between the plaintiff's

version of events and that given by his witnesses: (1) while Parker states that Powell punched the plaintiff in the face, the plaintiff does not; (2) while the plaintiff denies swinging at Powell, Whiting states that he did so, and Adams states the plaintiff told her he did so; (3) while the plaintiff denies striking Powell, Parker states that he did so (after Powell struck him); (4) while Adams states that the second officer kneed the plaintiff in the groin and stomach area, the plaintiff does not; and (5) while Whiting states that an officer struck the plaintiff with a flashlight when he was on the ground, the plaintiff does not.  (Doc. 56 at 4-6).

       According to the defendants, the Court on motion for summary judgment is required to credit, on all five of these points, the version of events most favorable to them. (Doc. 56 at 6).  This is so, they say, because the Court may not assume a version of events proffered by one party that is "blatantly contradicted by the record, so that no reasonable jury could believe it."  (*Id*. at 2).  For this proposition, they rely on *Scott v. Harris*, 127 S. Ct. 1769 (2007).  In *Scott*, however, the plaintiff's testimony that he drove carefully and posed no danger to other motorists or pedestrians was "utterly discredited" by a videotape of the police chase of his vehicle, which videotape the plaintiff did not contend was doctored or otherwise inaccurate.  *Id*. at 1775-76.  There is no incontrovertible videotape of the incident under review here, and the mere fact that four witnesses to a brief, unexpected, and traumatic episode came away with somewhat different (though largely consonant) recollections hardly establishes that no reasonable jury could believe the version most favorable to the plaintiff.

       The Eleventh Circuit has stated that, "[w]hen the nonmovant has testified to events, we do not ... pick and choose bits from other witnesses' essentially incompatible accounts ... and then string together those portions of the record to form the story that we deem most helpful to the nonmovant."  *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc).  "Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no

duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided." *Id*. The defendants have not invoked *Evans* and thus have waived its application here. It is in any event unhelpful to them.

*Evans* holds that a party opposing summary judgment may not ignore his own damaging testimony on a particular point and substitute on that point the more helpful testimony of another witness. In *Evans*, this rule prevented the plaintiffs from relying on the defendant's testimony that one plaintiff did not resist or protest the challenged strip search, when the plaintiffs had testified that he did resist and protest. 407 F.3d at 1276-78 & nn. 4, 6-7. This Court has applied *Evans* to hold that a plaintiff in a retaliation case could not rely on the defendant's memorandum indicating that the plaintiff complained of race discrimination in April 2002, when the plaintiff testified that he did not complain of race discrimination until October 2002. *Sullivan v. City of Satsuma*, 2005 WL 2895983 (S.D. Ala. 2005). This Court later applied *Evans* to hold that a plaintiff in a sexual harassment case could not rely on the harasser's testimony that he had rubbed her shoulders and told dirty jokes in her presence, when the plaintiff testified that the defendant did neither. *Carter v. University of South Alabama Children's & Women's Hospital*, 510 F. Supp. 2d 596, 601 n.7 (S.D. Ala. 2007).

The defendants' critique of the evidence does not fit the *Evans* paradigm. As to the second and third circumstances, the plaintiff is not ignoring his own testimony on these points but is affirmatively relying on his testimony that he did not swing at or strike Powell. As to the first, fourth and fifth circumstances, the plaintiff is relying on the testimony of his witnesses that Powell punched him in the face, that he was kneed in the groin and stomach, and that he was clubbed with a flashlight while lying prone on the ground. However, the defendants have identified no deposition testimony by the plaintiff in which he denies being punched, kneed or clubbed, or in which he affirms that there was no physical contact with him other than as described in his deposition, and his testimony that the defendants "beat the s**t out of" him after he was on the ground would

appear affirmatively consistent with his having been clubbed.

The primary focus of the defendants' attack on the evidence is the second and third circumstances, because it is central to their position that the plaintiff was resisting arrest and so was subject to lawful force in subduing him.  (Doc. 56 at 6-7).  The plaintiff's unequivocal testimony that he did not strike or swing at Powell can be ignored only if, by presenting witnesses to support his case, he is required to accept all unfavorable portions of their testimony, even though he does not rely on that unfavorable testimony.  The defendants cite no authority for this unlikely proposition, and nothing in *Scott* or *Evans* suggests such a radical reading of Rule 56.  *Scott* says that a nonmovant's version of the evidence is to be rejected on motion for summary judgment only when that version is so "blatantly contradicted by the record" that "no reasonable jury could believe it." 127 S. Ct. at 1776.  Similarly, Judge Carnes concurred specially in *Evans* to note that the Court's "warts and all" approach to a nonmovant's testimony is explained by the observation that, "absent some extraordinary circumstance, no reasonable jury would believe that a party was lying when he said something harmful to his own case," since "[r]easonable juries know that is not how human nature, influenced by self-interest, works."  407 F.3d at 1284.[3]  Surely a reasonable jury could believe the plaintiff's testimony that he did not strike Powell or otherwise resist arrest,[4] and these witnesses have not been shown (or

---

[3]This explanation seems somewhat inadequate to support the *Evans* rule, since a reasonable jury could conclude — as juries often do — that a litigant is not lying but is innocently mistaken about a particular point, and since it is not immediately apparent why a reasonable jury would necessarily hold a party's innocent mistakes against him.  The explanation is significant, however, because it reflects that controverted testimony adverse to a nonmovant cannot be credited on motion for summary judgment unless no reasonable jury could disbelieve it.

[4]Without purporting to be exhaustive, a jury could determine that the witnesses were not in a position to see exactly what the plaintiff did; that they misconstrued his alleged defensive movement as aggression and/or his alleged incidental contact with Powell as a blow; that Adams did not hear correctly; and that Powell (who had an incentive to do so) falsified his account.

even alleged) to be so invested in securing a plaintiff's verdict that any testimony of theirs that fails to help his case must, should, or even can be deemed true on that basis alone.

In summary, for purposes of deciding the instant motion, the Court will not reject any of the evidence on which the plaintiff relies to establish what occurred during the incident. From the testimony of the plaintiff's witnesses — supplemented by portions of the officers' testimony pointed out by them that does not conflict with the plaintiff's version — the following picture emerges, viewing all facts and drawing all reasonable inferences in favor of the plaintiff.

Powell became annoyed with the plaintiff's insistence that he and his helpers cross the barricade into Royal Street to retrieve the horses. Powell approached the plaintiff, punched him in the face, grabbed him by the neck, and lifted him. The plaintiff tried unsuccessfully to push Powell off him. Sanchez came up from behind and struck the plaintiff on the head with a flashlight. The officers spun the plaintiff around, and one held him in a headlock, where he stood passively, while the other kneed him five or six times in the groin and stomach area before they threw him to the ground, where they both got on top of him. The plaintiff, lying on his stomach and face with his hands under him, squirmed around, for a few seconds preventing the officers from grabbing his hands and handcuffing him. (Powell Dep. at 68-69; Sanchez Dep. at 41-42).[5] The plaintiff was not flailing his legs. (Goff Dep. at 12). Once the officers got his hands behind his back, Powell quickly cuffed him. (Powell Dep. at 69; Sanchez Dep. at 42). After the plaintiff was cuffed, and while he was lying still and prone with both officers on top of him, one officer repeatedly struck him in the ribs with his fist, while the other repeatedly struck him on the head with a flashlight.[6] The physical portion of the incident lasted as long as

---

[5]The officers in brief describe this as "brief resistance." (Doc. 44 at 7).

[6]The officers apparently would say that no flashlight was involved but only a taser that did not discharge, and that any striking of the plaintiff, if it occurred, did so while he was refusing to surrender his hands to be cuffed. Because Powell testified that he swiftly

two minutes, half of which may have consisted of the post-handcuffing beating.

### B.  Fourth Amendment.

The complaint alleges that the officers "violated the Plaintiff's federal constitutional right not to be subjected to excessive or unreasonable force during arrest." (Doc. 1 at 5, ¶ 26).  The officers argue that they are entitled to qualified immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  The burden then shifts to the plaintiff to show that the defendants' conduct "violated a clearly established statutory or constitutional right."  *E.g., Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).  The inquiry may be broken down into two parts: (1) whether the facts alleged, if true, would establish a violation of the plaintiff's rights; and (2) whether these rights were clearly established at the time of the alleged deprivation.  *E.g., id.*

### 1.  Discretionary authority.

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law."  *Harbert*

---

handcuffed the plaintiff once his hands were behind him, and because Whiting testified that the plaintiff's arms were behind him when he was beaten, the reasonable inference most favorable to the plaintiff is that he had been handcuffed before being beaten.

*International, Inc. v. James*, 157 F.3d at 1281 (emphasis added).  The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application."  *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted).  That is, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."  *Harbert International*, 157 F.3d at 1282 (internal quotes omitted).  For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners.  *Id*. (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

"Because making an arrest is within the official responsibilities of a sheriff's deputy, [the defendant] was performing a discretionary function when he arrested [the plaintiff]," allegedly using excessive force in the process.  *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir.2004); *accord Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).  What is true of a sheriff's deputy is surely true of a police officer, and the plaintiff does not dispute that the officers were acting within their discretionary authority.  Accordingly, the officers have met their burden.  *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir.2007) (where the plaintiff did not dispute that the deputy was acting within his discretionary authority at the time of arrest, the burden shifted to the plaintiff to

overcome the qualified immunity defense).

### 2. Constitutional violation.

The right to arrest carries with it the right to use physical coercion or its threat in order to effect the arrest, and arrests typically involve some force and injury. *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008). Nevertheless, "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006). When, as here, the plaintiff does not question the existence of probable cause to arrest, the arresting officer's subjective intent is irrelevant, and the constitutional issue is measured by whether the force employed was "objectively reasonable." *Reese*, 527 F.3d at 1272.

The evidence, viewed most favorably to the plaintiff, indicates that Powell and Sanchez repeatedly beat the plaintiff — one with his fist, the other with a flashlight — after they had handcuffed him behind his back and while he was lying still and prone on the ground with them on top of him. "Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierriz*, 526 F.3d 1324, 1330 (11th Cir. 2008). This is true even if the suspect had previously resisted arrest but had been handcuffed and was no longer resisting at the time the force was applied. *Id*. at 1331 (if the defendant punched the plaintiff "after he stopped resisting," then "there is a constitutional violation"). The beating of handcuffed, non-resisting suspects has repeatedly been held to violate the Fourth Amendment. *E.g., Davis*, 451 F.3d at 767; *Vinyard*, 311 F.3d at 1347-48; *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2004); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000).

In *Hadley*, the Court held that a single punch to the stomach of a suspect who "was handcuffed and not struggling or resisting" constituted excessive force. 526 F.3d at 1330. Here, there is evidence that the officers punched the plaintiff in the ribs, and struck him on the head with a flashlight, repeatedly and for as long as a full minute after he had been

-12-

handcuffed and was not struggling or resisting.  That evidence, if believed by the jury, would thus establish a constitutional violation.

The officers address none of these cases except *Lee*.  In *Lee*, the defendant arrested the plaintiff for honking her car horn on a busy street.  After pulling the plaintiff from her car and handcuffing her, the defendant led the plaintiff to the back of the car and slammed her head on the trunk.  284 F.3d at 1191.  The Court evaluated this evidence as follows:

> Even though [the defendant] undoubtedly possessed the lawful power to effect a custodial arrest and secure [the plaintiff] with handcuffs, a reasonable officer could not possibly have believed that he then had the lawful authority to take her to the back of her car and slam her head against the trunk *after* she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed.  Once an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose.

*Id*. at 1199 (emphasis in original).

The officers suggest *Lee* is inapplicable because "there is no evidence the plaintiff was struck after being handcuffed."  (Doc. 56 at 12).  As noted above, there is.  The officers also suggest that *Lee* is inapplicable because the plaintiff had pushed Powell and so both posed a threat to him and resisted arrest.  (*Id*.).   All threat and all resistance, however, had ended before the officers allegedly beat him in the ribs and on the head while he was handcuffed and lying face down on the street with both officers on top of him.[7]

---

[7]The officers note that the defendant in *Lee* was eight inches taller and 30 pounds heavier than the plaintiff, (*id*. at 11), apparently to suggest that any threat to the defendant in that case would be more easily quelled than in this one.  The unarmed plaintiff here was 5' 11" tall, but he was also 280 pounds heavy and 63 years old — not exactly fighting trim.  (Plaintiff Dep. at 12, 135-36).  Powell was also 5' 11", but he weighed a more manageable 200 pounds and was decades younger than the plaintiff, and Sanchez added another 160 pounds to the mix.  (Powell Affidavit; Sanchez Dep. at 43).  At any rate, whether or not the plaintiff was physically *capable* of posing a threat while lying prone on the street with his hands handcuffed behind him and two officers sitting on him, there is not the slightest evidence that he *did* then pose a threat.

-13-

The officers request the Court to apply the three factors identified in *Graham v. Connor*, 490 U.S. 386 (1989), for assessing the objective reasonableness of an application of force: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. (Doc. 44 at 17-18). The Court, like *Lee* and the other cases cited above, has already applied the second and third factors, and the first does not assist the officers.

Powell arrested the plaintiff for failure to obey a lawful order. (Powell Dep. at 73). The officers do not identify the lawful order, instead noting only Powell's testimony that, when he told the helpers they were not coming into Royal Street, Adams said, "Yes, they are." (Doc. 44 at 7, 18; Powell Dep. at 53).[8] "[G]enerally[,] more force is appropriate for a more serious offense and less force is appropriate for a less serious one ...." *Lee*, 284 F.3d at 1198. The officers do not explain how the severity of the crime of failing to obey a lawful order (whatever it was) could support the alleged use of post-handcuffing force, and it plainly does not. *Cf. Davis*, 451 F.3d at 764, 767 (obstruction of justice and disorderly conduct were not "serious crime[s]"); *Vinyard*, 311 F.3d at 1347 ("[The defendant's] crimes, disorderly conduct and obstruction, were of minor severity."); *Lee*, 284 F.3d at 1198 ("[I]t is difficult to imagine a less significant crime than honking one's horn on a busy downtown thoroughfare.").

In summary, accepting as true for present purposes the plaintiff's version of the facts, the officers violated his Fourth Amendment right to be free of excessive force.[9]

---

[8]It is not immediately apparent how verbally disagreeing with a police officer constitutes disobedience of an order. Nevertheless, since the plaintiff does not contend there was no probable cause for the arrest, the Court assumes it existed.

[9]Because a constitutional violation is made out by the force employed after the plaintiff was handcuffed, it is unnecessary to consider whether all or any of the force used before that point was also excessive.

**3. Clearly established law.**

To be clearly established, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like situated reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The law is clearly established if any of three situations exists. As discussed below, multiple Eleventh Circuit precedents demonstrate that at least the second of these situations is present here.

"First, the words of the pertinent federal statute or constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the total absence of case law." *Vinyard*, 311 F.3d at 1350 (emphasis omitted).

"Second, ... some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard*, 311 F.3d at 1351. "For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional without tying that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation." *Id.*

"Third, [when] the Supreme Court or we, or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances,'" then if "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar [to those involved in the opinion], the precedent can clearly establish

-15-

the applicable law." *Vinyard*, 311 F.3d at 1351-52.  When case law is utilized to show that the law was clearly established, it must pre-date the challenged conduct.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

"We hold that a handcuffed, non-resisting defendant's right to be free from excessive force was clearly established in February 2002."  *Hadley*, 526 F.3d at 1333 (citing *Lee* and *Skrtich v. Thornton*, 280 F.3d 1295, 1303 (11th Cir. 2002) as having established this proposition); *accord Reese*, 527 F.3d at 1273 n.33 ("[W]e have no difficulty finding that by September 2003, previous case law clearly established that officers may not use excessive force against a non-resisting suspect who has already been subdued.") (citing *Hadley*); *Lee*, 284 F.3d at 1200 (at least as of 2002, there existed a "clear and obvious principle that once an arrest  has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ the severe and unnecessary force allegedly used here") (citing *Slicker*, *Priester v. City of Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000), and *Smith v. Mattox*, 127 F.3d 1416, 1418-20 (11th Cir. 1997));  *Buckley v. Haddock*, 2008 WL 4140297 at *5 n.12 (11th Cir. 2008) ("In addition to *Lee*, other cases then in existence [*Vinyard* and *Slicker*] similarly established that an officer may not use force against an arrestee who was handcuffed and who was not resisting arrest.").

It was likewise clearly established as of December 2005 that the mere fact a suspect had previously resisted arrest furnishes no grounds for continuing to beat him after he is handcuffed, subdued, and not resisting.  *Hadley*, 526 F.3d at 1331, 1333 (even if the plaintiff resisted arrest at an earlier point, it was clearly established in February 2002 that the defendant could not gratuitously punch him in the stomach after he was handcuffed and had stopped resisting; *Wells v. Creamer*, 262 Fed. Appx. 184, 188-89 (11th Cir. 2008) (where the plaintiff in February 2000 fled and resisted attempts to be placed in handcuffs, and where the defendants continued to beat him as he lay face down on the ground in handcuffs without resisting, their alleged conduct "facially violates the

-16-

Fourth Amendment with obvious clarity and violates clearly established law in view of our decision in *Smith* [*v. Mattox*].”);  *Hall v. Alabama Department of Public Safety*, 249 Fed. Appx. 749, 750-51 (11th Cir. 2007) (where the plaintiff in 2004 ran from the arresting officer, and where the defendant allegedly maced him after handcuffing and subduing him, the allegations were “sufficient to show a violation of Plaintiff’s clearly established rights under *Vinyard*”).

These cases comprise a non-exhaustive list of those reflecting that it was clearly established in 2005 that beating a handcuffed, non-resisting arrestee, even one that had previously resisted, violates the Fourth Amendment.  The defendants acknowledge only *Lee*, and offer only their unamplified ipse dixit that it is “distinguishable.”  (Doc. 44 at 24).  Because *Lee* (and most of the cases referenced above) are examples of the second situation identified in *Vinyard* and possibly the first — but not the third — any minor differences in circumstances are not material.[10]

In summary, under the plaintiff’s version of events, the officers’ conduct was unconstitutional and violated clearly established law.  Therefore, the officers cannot obtain qualified immunity on motion for summary judgment.

**C.  State-Law Claims.**

The plaintiff alleges that the officers’ conduct amounted to assault, negligence, and willfulness/wantonness.  (Doc. 1 at 5-7, 9-10).  The officers argue they enjoy peace officer immunity under Ala. Code § 6-5-338.  (Doc. 44 at 26-30).

> Every peace officer ... whose duties include the enforcement of
> ... the criminal laws of this state ... shall at all times be deemed to be

---

[10]Among these circumstances would be the precise force used.  *Hadley* reflects that it was clearly established in 2002 that even a single punch to the stomach is too much force to use on a handcuffed, non-resisting arrestee.  Although this case does not involve slamming the plaintiff’s head on the trunk of a car as in *Lee*, it does involve repeated punches to the ribs and repeated clubbings with a flashlight, which cannot seriously be viewed as less significant than the conduct in *Lee* or *Hadley*.

> officers of this state, and as such shall have immunity from tort liability
> arising out of his or her conduct in performance of any discretionary
> function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a).  "However, whether a qualified police officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)."  *Blackwood v. City of Hanceville*, 936 So. 2d 495, 504 (Ala. 2006) (internal quotes omitted).

*Cranman* extends immunity to a defendant's conduct in "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to law-enforcement officers' arresting or attempting to arrest persons."  *Blackwood*, 936 So. 2d at 504 (internal quotes omitted).  The plaintiff does not question the proposition that the officers' conduct falls within this portion of *Cranman*.  (Doc. 53 at 5).

Even if conduct falls within a category identified in *Cranman*, the defendant is not immune if he "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."  *Blackwood*, 936 So. 2d at 503-04 (internal quotes omitted).  The officers posit that no reasonable jury could find their conduct was such, (Doc. 44 at 28-29), but they offer no legal or analytical support for this bald conclusion.  Given the version of the evidence which it must accept for present purposes, the Court easily concludes that the evidence presents a genuine issue of material fact as to whether the officers acted willfully, maliciously or in bad faith.

As noted, Count Three sounds in negligence.  "This Court has previously held that poor judgment or wanton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in *Cranman*."  *Ex parte Randall*, 971 So. 2d 652, 664 (Ala. 2007).  Because a peace officer is immunized from liability for his negligent conduct, Count Three must be dismissed.  Likewise, Count Seven must be dismissed to the extent it purports to rest on the alleged wantonness of the officers.

In summary, the officers are entitled to summary judgment with respect to Count

Three and the wantonness aspect of Count Seven, but they are not entitled to summary judgment with respect to the balance of the plaintiff's state-law claims.

## II. The Governmental Defendants.

The parties agree that MPD "is a division of the City of Mobile." (Doc. 1, ¶ 9, Doc. 12, ¶ 9). The governmental defendants assert that MPD is therefore "a non-entity" not subject to suit. (*Id*. at 1). As probable as this appears,[11] the governmental defendants have not moved for summary judgment on this ground. Thus, MPD's ability to obtain summary judgment depends on the City's ability to do so.

The plaintiff concedes that the City is entitled to summary judgment with respect to his Fourth Amendment claim. (Doc. 53 at 7). That concession leaves for consideration the plaintiff's two claims against the City based on respondeat superior and one claim based on the City's negligence.

### A. Respondeat Superior.

According to Count Four, the officers acted carelessly, with neglect and/or unskillfulness, and the City is liable for their conduct pursuant to Ala. Code § 11-47-190. According to Count Six, McLain acted carelessly, without skill and with neglect in failing to train and supervise the officers, and the City is liable for his conduct pursuant to the same section. (Doc. 1 at 6-9).

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless said injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality, engaged in work therefor and while acting in the line of his duty ....

Ala. Code § 11-47-190.

---

[11]*Dean v. Barber*, 951 F.2d 1210, 1214, (11th Cir. 1992) ("Sheriff's departments and police departments are not usually considered legal entities subject to suit ....").

It may be assumed for present purposes that the state-law claims against the City fall within this provision's exception to sovereign immunity.[12]  It is, however, not the only immunity provision at issue.  The peace officer immunity discussed in Part I.C. protects not only officers but also "governmental units or agencies authorized to appoint peace officers."  *Id*. § 6-5-338(b).  *E.g., Ex parte City of Gadsden*, 781 So. 2d 936, 940 (Ala. 2000) ("The plain language of [Section 6-5-338(b)] extends that discretionary-function immunity to the City.").  Under that section, the City is immune from liability for the negligent conduct of its officers.  *E.g., City of Birmingham v. Sutherland*, 834 So. 2d 755, 762 (Ala.  2002) ("Allegations of negligence are not sufficient to remove the immunity the City is provided [under Section 6-5-338] for [a peace officer's] performance of a discretionary function."); *accord Howard v. City of Atmore*, 887 So. 2d 201, 211 (Ala. 2003) (Section 6-5-338 "shields the City from liability for the alleged 'neglect, carelessness and unskillfulness' of" its officer).   Accordingly, Section 6-5-338 provides the City immunity.

The plaintiff insists that the City can be held liable for the negligent conduct of McLain and the officers, pursuant to Section 11-47-190.  (Doc. 53 at 6).  For this proposition, he relies on *City of Birmingham v. Thompson*, 404 So. 2d 589 (Ala. 1981).  *Thompson*, however, was decided in 1981, long before Section 6-5-338 added peace-officer immunity in 1994.

The plaintiff cites two cases for the proposition that, even after 1994, municipalities have been held liable for a police officer's negligent conduct under Section 11-47-190.  (Doc. 53 at 5-6).  Neither case aids his cause.  In *Stovall v. Allums*, 2005 WL 2002069 (M.D. Ala. 2005), the police officer was not entitled to immunity under Section 6-5-338.  *Id*. at *10-11.  Because the officer was not immune under Section 6-5-338,

---

[12]*See City of Birmingham v. Thompson*, 404 So. 2d 589, 592 (Ala. 1981) (the use of excessive force against a pretrial detainee can result from an officer's "unskillfulness" as the term is used in Section 11-47-190).

neither was the City, leaving the City exposed under Section 11-47-190.  Here, the officers are immune under Section 6-5-338(a) for their allegedly negligent conduct, so the City is likewise immune under Section 6-5-338(b).  In *Stephens v. City of Butler*, 509 F. Supp. 2d 1098 (S.D. Ala. 2007), the Court concluded that a municipality can never be liable for the negligent conduct of a police officer, because Section 6-5-338 precludes officer liability for negligent conduct, and a city cannot be liable under Section 11-47-190 if the officer is immune under Section 6-5-338.  *Id*. at 1116.  *Stephens* thus directly opposes the plaintiff's position.

In summary, the City is entitled to summary judgment with respect to Counts Four and Six.

### B. Negligence.

Count Five alleges that the City negligently failed to train and supervise the officers and negligently failed to generate adequate policies and procedures governing their conduct.  (Doc. 1 at 8).  The City argues that it cannot be liable for negligent failure to train or supervise unless the plaintiff produces evidence of past acts of incompetence by the officers, and it insists there is no such history.  (Doc. 48 at 22-23).[13]  The plaintiff makes no argument in response.

Claims of negligent training and negligent supervision require the plaintiff to show that the employee was incompetent and that the employer knew of, or had notice of, the employee's incompetency based on past conduct reflecting the incompetency.  *Pritchett v. ICN Medical Alliance, Inc*., 938 So. 2d 933, 940 (Ala. 2006); *Mardis v. Robbins Tire &*

---

[13]Negligent failure to generate policies and procedures is a species of negligent failure to train and/or supervise.  *See, e.g., Howard*, 887 So. 2d at 209 (where the complaint alleged, inter alia, the failure to "implement and/or enforce procedures relating to the identification and handling of potentially suicidal inmates," Court ruled that "[s]imply stated, the claims ... allege faulty training and supervision.").  Thus, the same principles apply.

*Rubber Co.*, 669 So. 2d 885, 889-90 (Ala. 1995).  The City has pointed out the plaintiff's lack of such evidence, and the plaintiff has not produced any evidence in response. Accordingly, the City is entitled to summary judgment with respect to Count Five.[14]

## CONCLUSION

For the reasons set forth above, the motions for summary judgment as to the City, MPD, McLain, and Goff are **granted**.  The motion for summary judgment as to Powell and Sanchez is **granted** with respect to Count Three and the wantonness portion of Count Seven, and is in all other respects **denied**.

DONE and ORDERED this 9th day of October, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[14]The City addresses Counts Two and Seven as if those claims were directed against it.  (Doc. 48 at 21, 23-24).  By their terms, they are not.  (Doc. 1 at 5-6 (seeking relief from "the Defendants," identified as Powell, Sanchez and Goff); *id*. at 9-10 (seeking relief from "these Defendants," identified as Powell, Sanchez, Goff and McLain)).  The plaintiff does not argue otherwise.  In any event, these claims allege that the defendants acted intentionally (as reflected in the demand for punitive damages), and the City is immune from liability for the intentional torts of its employees.  *E.g., Todd v. Kelley*, 783 So. 2d 31, 42-43 (Ala. Civ. App. 2000) (Section 11-47-190 precludes claims based on intent, willfulness or wantonness).